*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0660

DIANDRE CAESAR, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF3-4933)
(Andrea L. Hertzfeld, *Judge*)

(Argued December 16, 2025                    Decided June 11, 2026)

*Adrian E. Madsen* was on the brief for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Travis Wolf*, and *Michael Toogun,* Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, HOWARD, *Associate Judge*, and GLICKMAN, *Senior Judge.*

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Diandre Caesar appeals his convictions and aggregate eight-year sentence. A jury convicted Mr. Caesar of two counts of assault with a deadly weapon (ADW) and two counts of possession of a firearm during a crime of violence (PFCV), in connection with a shooting that

occurred on June 28, 2022. Mr. Caesar argues that the trial court erred in several discrete ways: (1) failing to grant his motion to suppress an out-of-court photo identification because it was tainted by an unduly suggestive procedure and was not reliable; (2) failing to suppress an in-court identification of Mr. Caesar; and (3) declining to order the United States to produce the names of witnesses to a shooting committed by another individual with another firearm, which Mr. Caesar argues might have allowed him to present a *Winfield* defense. Mr. Caesar also contends that the evidence was insufficient to permit a finding beyond a reasonable doubt that the elements of intent-to-frighten assault were met when neither victim saw the gun. Additionally, Mr. Caesar argues that resentencing is required because the court erroneously believed during his sentencing that D.C. Code § 22-402 (ADW sentencing), D.C. Code § 22-4504(b) (PFCV sentencing), or the D.C. Voluntary Sentencing Guidelines required sentences for ADW and PFCV to run consecutively to one another.

We affirm the judgment of the trial court and remand to the trial court to vacate one of Mr. Caesar's two PFCV convictions.[1]

---

[1] Regarding his sentencing, Mr. Caesar argues that because the two PFCV convictions merge, one must be vacated. The government agrees with this claim, so it is not addressed further below.

## I.       Factual Background & Procedural History

Trial testimony demonstrated the following. On June 28, 2022, Jeffrey Smith, along with his then-girlfriend, Shelby Bell Greene, and their infant child, L.R.S., drove to a McDonald's on New York Avenue next to a Salvation Army warehouse in Northeast D.C. to purchase marijuana. Meanwhile, in the adjacent Salvation Army parking lot, Mr. Caesar was at work, mowing the grass along the chain-link fence that separated the two lots. About one minute prior to the altercation, Mr. Caesar tossed a black milkcrate that was in his mowing path over the chain-link fence and onto the McDonald's property. The milkcrate landed in the exit lane next to the McDonald's drive-thru lane.

When attempting to leave the McDonald's parking lot after concluding his purchase, Mr. Smith discovered that the milkcrate was blocking the lane, so he stopped his car, got out, and threw the milkcrate over the fence back into the Salvation Army parking lot. When Mr. Caesar saw Mr. Smith throw the milkcrate back onto his side of the fence, he jogged over to it, picked it up, and on his second attempt threw it back over to the McDonald's side where it hit Mr. Smith's car. Mr. Smith stopped the car again and this time got out to confront Mr. Caesar. The men, and Ms. Greene from the car, argued for about two minutes, shouting racial and sexual epithets at each other through the chain-link fence.

When another car pulled in behind Mr. Smith's car in the exit lane and beeped for him to move, the argument came to an end. Mr. Smith threw the milkcrate back over to the Salvation Army side of the fence once more, returned to his car, and drove forward to exit the McDonald's. Meanwhile, Mr. Caesar walked to the front of the Salvation Army parking lot, jumped over the fence, and proceeded down the sidewalk to the front of Mr. Smith's car where he was waiting to exit onto New York Avenue.

This time, when Mr. Caesar approached the car, he had his left hand in a small cross-bag slung over his right shoulder, held in front of him, with his elbow cocked. Ms. Greene initially stated that she thought he "probably has a gun" in the bag, even though shortly after she mocked Mr. Caesar, saying "what you got in there" and commenting later, "you ain't got shit in that f***ing thing." Mr. Caesar, in response, made a "come on" motion with his right hand, while keeping his left hand in the bag, and yelled at the car's occupants. During this back and forth, Mr. Caesar moved to the passenger side of the car and attempted to open the door. While this was happening, Mr. Smith was finally able to proceed out of the parking lot and onto New York Avenue. Mr. Caesar, continuing to yell at the car's occupants, walked out into the street where Mr. Smith's car was stopped, punched the passenger-side window, and kicked the side and back bumper. Instead of waiting for the turning lane to the eastbound side of New York Avenue to become available, Mr. Smith

turned right, onto the westbound side of the road, and Mr. Caesar moved to the sidewalk, continuing to hold his hand in his bag, while yelling at the car's occupants. As they drove past Mr. Caesar, Mr. Smith and Ms. Greene heard gunshots hit the back of their car. Ms. Greene yelled, "Go, Go, Go!" as the car picked up speed.

Mr. Smith drove to a gas station to check on the couple's infant child, who was in a car seat in the rear seat during these events. When Mr. Smith observed that there were bullet holes in the back of the car, they returned to the scene of the incident where police were already investigating, having been called in by a witness's 911 call. Police recovered casings on the sidewalk in front of the Salvation Army and learned of Mr. Caesar's identity from his supervisor, Christopher Wallace, who informed police that Mr. Caesar had been the employee mowing grass at that location. In response to police questioning, Mr. Smith described the shooter as a tall black man, wearing all black, with dreads. He also reviewed his car's dash cam footage of the incident several times with one of the investigating officers. The officer then showed Mr. Smith a photo of Mr. Caesar, taken from a police database, and Mr. Smith identified him as the shooter.

Prior to trial, Mr. Caesar filed a motion to compel discovery seeking information related to a search warrant executed in March 2023, which was conducted in connection with a shooting that took place in February 2023. During that search of an apartment, police recovered a Patmos Polymer P80 Ghost Gun,

which ballistics testing revealed was *not* connected to the February shooting but showed a potential link with gun casings recovered from Mr. Caesar's case. One of the occupants of the apartment, Zion Ray-Valentine, was arrested on charges relating to gun possession, but the matter was ultimately not prosecuted. As discussed, *infra*, Mr. Caesar sought the names and contact information of the witnesses of the February shooting and argued that he was entitled to more information about the March search under *Brady v. Maryland*. He also claimed that such information would reveal exculpatory *Winfield* evidence of a third party-perpetrator in his case because there were similarities between the February shooting and the shooting at issue here.

The government opposed the motion, arguing, inter alia, that the March search was too attenuated to the shooting with which Mr. Caesar was charged. The trial court agreed and denied his motion because it did not find a sufficient nexus between the two shootings, concluding that the request was "too attenuated" and "speculative."

Mr. Caesar also filed a motion in limine to exclude Mr. Smith's out-of-court identification of Mr. Caesar approximately one hour after the shooting, arguing that it was too suggestive given that police showed Mr. Smith a single photo of Mr. Caesar without comparators. The government argued that the identification was reliable and that the reliability outweighed any suggestivity. The trial court found

that the identification was "sufficiently reliable" and denied Mr. Caesar's suppression motion. Mr. Caesar also sought to suppress any in-court identification of Mr. Caesar by Mr. Smith, but the court declined to rule on the issue. The government stated it would not ask or instruct Mr. Smith to make such an identification but argued that the witness "should [] be allowed to do that – spontaneously" if he, unprompted, identified Mr. Caesar as someone he recognized while testifying.

A jury convicted Mr. Caesar of two counts of ADW (against Mr. Smith and Ms. Greene) and two corresponding counts of PFCV, but it acquitted him of the remaining charges of assault and gun possession charges as to the infant, L.R.S., carrying a pistol without a license, possession of an unregistered firearm, unlawful possession of ammunition, and cruelty to children. Mr. Caesar was sentenced to a combined eight-years' incarceration.

## II.    Discussion

### A.    The Motion to Compel

Mr. Caesar argues that the trial court erred in denying his motion to compel the government's production of the names of witnesses to a February 2023 shooting committed by another individual using a different firearm, and other information related to the execution of a subsequent search warrant, which, he contends, may have allowed him to present a *Winfield* defense. He argues that the information

should have been disclosed by the government under *Brady*'s "arguably material" standard, *Vaughn v. United States*, 93 A.3d 1237, 1262 n.29 (D.C. 2014), and that knowledge of the name of the suspect and other information about the later shooting may have allowed Mr. Caesar to present a *Winfield* third party-perpetrator defense. He claims that the trial court's error was in "conflating the ultimate standard— relevance" of potential *Winfield* material with the lower "arguably material" standard "governing pretrial disclosure of *Brady* material," in denying his motion. We disagree.

Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "*Brady* is not a discovery rule but a rule of fairness and minimum prosecutorial obligation." *Miller v. United States*, 14 A.3d 1094, 1107 (D.C. 2011) (quoting *Curry v. United States*, 658 A.2d 193, 197 (D.C. 1995)). "To determine on appeal whether the government, through its representatives in the trial court, has violated its obligations under *Brady*," this court considers: "'(1) whether the information in question is favorable to the accused; (2) whether this information was possessed and suppressed by the government, either willfully or inadvertently; and (3) whether that information was material' to guilt or punishment." *Turner v. United States*, 116 A.3d 894, 913 (D.C. 2015) (quoting

*Vaughn*, 93 A.3d at 1254). However, "[a]ppellants have the burden of proving a *Brady* violation." *Id.* (citing *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011)).

Concerning the third factor, materiality, "[e]vidence is material within the meaning of *Brady* 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Miller*, 14 A.3d at 1115). In other words, "the materiality threshold is met if, in the absence of proper disclosure, [this court] question[s] whether the defendant received a fair trial and [its] 'confidence' in the outcome of the trial is thereby 'undermined.'" *Vaughn*, 93 A.3d at 1262 (citation modified) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). While "defer[ing] . . . to the [trial court]'s assessments of credibility, evaluations of the weight of the evidence and the inferences to be drawn therefrom, and findings of historical fact, so long as they have record support," we will "respect, but . . . not accord comparable deference to, the judge's determination of the ultimate question of *Brady* materiality" and "review it *de novo* on appeal," since materiality is ultimately "a legal conclusion." *Turner*, 116 A.3d at 915.

While sharing similarities with *Brady*, the standard under *Winfield* is that there must be "proof of facts or circumstances which *tend to indicate some reasonable possibility* that a person other than the defendant committed the charged offense."

*Bruce v. United States*, 820 A.2d 540, 543 (D.C. 2003) (emphasis added) (quoting *Winfield v. United States*, 676 A.2d 1, 4 (D.C. 1996) (en banc)). "[R]easonable possibility" can be shown by "some evidence, either circumstantial or direct, of a third party's actions, motives, opportunity, statements or declarations against penal interest . . . which, in the aggregate, establishes the necessary link, connection or nexus between the proffered evidence and the crime at issue." *(Terry) Johnson v. United States*, 136 A.3d 74, 80 (D.C. 2016) (quoting *Boykin v. United States*, 738 A.2d 768, 774 (D.C. 1999)).

Winfield* makes clear that "the test remains that of relevance," such that "evidence that 'is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt'" will be excluded. *Winfield*, 676 A.2d at 4-5 (quoting *(Woredell) Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1989)). "A trial court's ruling on whether certain evidence is relevant or probative 'is a highly discretionary decision which will be upset on appeal only upon a showing of [abuse of discretion].'" *Bruce*, 820 A.2d at 543 (alteration in original) (quoting *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C. 1996)). Accordingly, we look for whether the court abused its discretion in finding that the evidence Mr. Caesar sought would not be relevant to any potential *Winfield* defense.

Mr. Caesar asserts that the government's knowledge of another shooting on February 16, 2023, was relevant to a potential *Winfield* defense because it may have identified a third-party shooter in his case. Mr. Caesar's theory of *Winfield* relevance is as follows: (1) the two shootings occurred about 1.5 miles from each other (albeit nine months apart), (2) GPS data from the Pretrial Services Agency demonstrates that Mr. Caesar could not have been the shooter in the February 2023 shooting, (3) the gun used in the June 2022 shooting was recovered from an apartment connected to the potential shooter in the February 2023 shooting (although ballistics evidence indicated the gun was *not* used in the February 2023 shooting), and (4) the February 2023 shooting was related to the purchase of a small quantity of marijuana, which Mr. Caesar argues may be related to the small quantity of marijuana purchased by Mr. Smith prior to the fight and shooting in June 2022. Mr. Caesar's counsel argued that despite the guns in the two shootings being different, a connection between the two existed because the police's investigation of the February 2023 shooting led them to the apartment of Zion Ray-Valentine, where the gun from the June 2022 shooting was found. Counsel noted that while Mr. Ray-Valentine claimed "he found [the gun] in the trash, . . . [t]hat's not how people come across guns in the city."

Yet, given that nearly nine months had passed between the June 2022 shooting and the March 2023 recovery of the gun pursuant to the search warrant of the

apartment, Mr. Ray-Valentine's possession of the gun alone does not "tend to indicate some reasonable possibility" that he was involved in the previous shooting. *Bruce*, 820 A.2d at 543 (citation omitted). Indeed, we have previously found that shell casings recovered five months apart "do not create a nexus sufficient to satisfy the *Winfield* standard" because "the handgun could easily have been passed around in the months following the [first] murder." *Hilton v. United States*, 250 A.3d 1061, 1073 (D.C. 2021); *see also Andrews v. United States*, 179 A.3d 279, 295-96 (D.C. 2018) (holding that when a potential third-party perpetrator's only link to the murder was his possession of the murder weapon six weeks before, the proffer was insufficient because there was no evidence placing him, inter alia, "in the neighborhood near the time of the shooting" and no evidence of motive to kill the victim). Further, in *Hilton*, we noted that "nothing tied [the] particular handgun to Hilton instead of his accomplice (who was not apprehended)" and held that "practical opportunity to commit the [] shooting" because of physical proximity alone without a showing of motive—or even knowledge of the victim's existence—was insufficient under the *Winfield* standard. *Hilton*, 250 A.3d at 1073-74.

The facts and sequence of events Mr. Caesar relies on for his *Winfield* theory are equally attenuated and speculative. He has pointed to no support in the record allowing an inference that Mr. Ray-Valentine (or any other person connected to the

February 2023 shooting)[2] was present at the scene of the June 2022 shooting in order to meet his burden under *Winfield* of showing "proof of facts or circumstances which tend to indicate some reasonable possibility" that Mr. Ray-Valentine was a third-party shooter. *Bruce*, 820 A.3d at 543. Additionally, Mr. Caesar has pointed to no evidence in the record that Mr. Ray-Valentine had any motive to shoot Mr. Smith, Ms. Greene, and their infant child. Rather, Mr. Caesar alleges a connection between the marijuana involved in the February 2023 shooting and the marijuana that Mr. Smith admitted to purchasing the day of the incident. He also implies that Mr. Ray-Valentine could have been Mr. Smith's drug dealer, a person who was never identified, and that Mr. Ray-Valentine may have been motivated to shoot Mr. Smith because of some issue with the transaction. While arguing his motion, Mr. Caesar contended that "[i]t is more than a mere coincidence that the perpetrator of the February 16, 2023, shooting sells marijuana and Mr. Smith was buying marijuana on June 28, 2022."

A speculative suggestion that two shootings have a sufficient nexus based on an allegation that both involve the sale of a small amount of marijuana does not meet

---

[2] It is unclear whether Mr. Caesar's theory at the time of the motion hearing was that Mr. Ray-Valentine or some other person was the purported third-party source of Mr. Caesar's anticipated *Winfield* defense in the June 2022 shooting.

the materiality test of *Brady*[3] or the "reasonable possibility" test of *Winfield.* Even in comparing the facts of the drug transactions, there are serious discrepancies. For instance, Mr. Smith represented that he had a preexisting relationship with his seller and no issues arose during their transaction at the McDonald's, whereas in the February shooting, the shooter was a stranger to the victim and asked the victim for help buying marijuana which led to a heated exchange followed by the shooting. This court has previously held that a trial court does not abuse its discretion in precluding evidence of an alleged third-party perpetrator when there is no evidence of specific motive. *See, e.g.*, *McCullough v. United States*, 827 A.2d 48, 56 (D.C. 2003) (finding no abuse of discretion when a court precluded evidence of an alleged third-party perpetrator based on the defense's claim that the victim's "lifestyle as a drug dealer gave others reason to kill her" without a showing of specific motive or practical opportunity). Additionally, this court has held that a defense proffer does not meet the "reasonable possibility" test and that a trial court does not abuse its discretion when it excludes evidence of an alleged third-party perpetrator based solely on the possibility that "a dissatisfied customer to whom [the victim] had sold

---

[3] To meet *Brady*'s disclosure requirements, a defendant must "show the government's actual possession of [the requested] exculpatory information," and this court has articulated that merely "having clues that, if pursued, could have led to the discovery of exculpatory evidence or information is not the same thing as actually having the exculpatory evidence or information in hand." *Bellinger v. United States*, 127 A.3d 505, 520-21 (D.C. 2015).

[drugs] might have shot him in retaliation" without a showing that "a person, if he or she actually existed, was connected in any way to the shooting." *Gethers*, 684 A.2d at 1272. The facts here are equally speculative, given that the identity of Mr. Smith's drug dealer is unknown, there is nothing in the record to suggest that Mr. Smith bought drugs from Mr. Ray-Valentine, there is nothing in the record to suggest that the June 2022 shooting was connected to Mr. Smith's earlier drug transaction, there is no forensic evidence connecting Mr. Ray-Valentine to the February 2023 shooting, and there is no forensic expert or lay witness testimony connecting Mr. Ray-Valentine to the June 2022 shooting—except that nine months later, he had possession of the gun involved. We need not reach additional arguments but briefly note that Mr. Caesar also alleges that he should have been permitted to view documentation of the negative NIBIN match between the casings recovered from the February 2023 shooting and the gun recovered in the search warrant.[4]

---

[4] Mr. Caesar's counsel admitted that he "ha[s] no reason to think that the Government is misleading me or the Court," but suggested, nevertheless, that the ballistics testing had not actually been performed, given that the government's attorney at the hearing stated, "I *believe* casings were recovered from that February shooting and they were submitted to the NIBIN system. But when the NIBIN comparison came back, those casings were not a match to the gun found in the March search warrant . . . ." Mr. Caesar offers no case law to support his proposition that he was entitled to see the NIBIN results of the comparison of the recovered gun with the February 2023 shooting after the government determined that there was no forensic connection between the two shootings.

Mr. Caesar also argues that the trial court erred in conflating *Winfield*'s relevance standard with the materiality standard of *Brady* in denying his motion to compel information that he argues should have been produced under *Brady*. We see no basis in the record to conclude that there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," as required under *Brady*. *Turner*, 116 A.3d at 913 (quoting *Miller*, 14 A.3d at 1115). Additionally, under the *Winfield* relevance standard, we see no basis in the record to conclude that the evidence Mr. Caesar requested—i.e., the names of witnesses and other information concerning the February 2023 shooting—was likely to have led him to a *Winfield* defense given the absence of evidence that any individual connected to the June 2022 shooting had a connection to any individual from the February 2023 shooting. Rather, Mr. Caesar's *Winfield* argument relies solely on the presence of the nearby recovered gun, nine months later, and speculative arguments concerning a potential drug connection—even though there is nothing in the record to suggest that the June 2022 shooting was in any way related to drugs or a drug transaction gone wrong. As Mr. Caesar cannot demonstrate that the information he sought would have met either the *Winfield* relevance standard or the *Brady* materiality standard, there is no error.

In sum, we hold that the trial court did not abuse its discretion in denying Mr. Caesar's motion to compel the government's production of the names of witnesses to a shooting committed by another individual using a different firearm.

**B.    The Out-of-Court and In-Court Identifications of Mr. Caesar by Mr. Smith**

Mr. Caesar also argues that the trial court erred when it denied his motion to suppress his out-of-court identification by Mr. Smith and then again when it permitted Mr. Smith to identify Mr. Caesar in court following his denied motion to suppress any such identification. His argument proceeds on three points: (1) that the trial court erred by relying on its own comparison of Mr. Caesar's appearance with the person depicted in the video footage when it considered the reliability of the out-of-court identification, (2) that the "impermissibly suggestive identification procedure" used by the police was not reliable, and (3) that the in-court identification should have been struck due to the government's pretrial statement that it did not think Mr. Smith would be able to identify Mr. Caesar at trial.

Mr. Caesar's challenge to the witness identifications here present "mixed questions of law and fact," which "[w]e review . . . under our usual deferential standard of review for factual findings . . . and [apply] de novo review to the ultimate legal conclusions based on those facts." *Young v. United States*, 305 A.3d 402, 435 (D.C. 2023) (alterations in original) (quoting *Hilton*, 250 A.3d at 1068). "This court

is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable if they are supported by the evidence and in accordance with the law." *Id.* (quoting *Kaliku v. United States*, 994 A.2d 765, 781 (D.C. 2010)). And "[a]n identification must be both impermissibly suggestive and unreliable to justify suppression on due process grounds." *Id.* at 435-46 (citing *Hilton*, 250 A.3d at 1068). Thus, "[e]ven if the procedure is found to be impermissibly suggestive, the government can defeat the motion to suppress by showing the identification was reliable nonetheless." *Hilton*, 250 A.3d at 1068 (citing *Kaliku*, 994 A.2d at 782).

A pretrial identification procedure that involves a single photograph may be impermissibly and unnecessarily suggestive "because of the strong implication that the individual has been singled out as the suspect by law enforcement." *Morales v. United States*, 248 A.3d 161, 172-73 (D.C. 2021) (holding that a single mugshot of a standalone suspect four months after the witness "glimpsed" the suspect was impermissibly suggestive in part because of the lack of comparators). However, "there is no rule of per se exclusion when a single photograph has been shown." *Young*, 305 A.3d at 436 (citing *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977); *see also, e.g.*, *id.* at 436-37 (holding that a witness's identification of his assailant with a single photograph was sufficiently reliable because the witness had "great" opportunity to observe his assailant earlier that night, had accurately described him

to police, and only a short passage of time passed between the assault and the identification).

This court has previously adopted the five-factor totality test set forth in *Neil v. Biggers*, 409 U.S. 188 (1972) to determine the reliability of an identification:

> (1) the witness's opportunity to observe the perpetrator at the time of the crime, (2) the degree of attention the witness paid to the perpetrator, (3) the accuracy of any prior descriptions of the perpetrator provided by the witness, (4) the level of certainty demonstrated by the witness at the time of the identification, and (5) the lapse in time between the crime and the identification procedure.

*Young*, 305 A.3d at 436 (quoting *Long v. United States*, 156 A.3d 698, 707 (D.C. 2017)). The first *Biggers* factor is typically considered the most important in the analysis. *See Morales*, 248 A.3d at 177.

Finally, if an identification is found to be both impermissibly suggestive and unreliable, the government must show that the failure to suppress it was harmless beyond a reasonable doubt. *See id.* at 181-82. Failure to do so must result in reversal. *See id.* (holding that the admission of an in-court identification was constitutional error in violation of the Fifth Amendment's Due Process Clause requiring reversal because the government failed to show that the error did not contribute to the verdict).

Mr. Caesar's motion in limine to suppress Mr. Smith's out-of-court identification—and any in-court identification he might make—argued that using a single photograph of Mr. Caesar was unduly suggestive and unreliable because Mr. Smith did not have sufficient opportunity to observe Mr. Caesar, who was a stranger to him and of a different race. The trial court disagreed that the identification was unreliable, and found, under the *Biggers* factors that: (1) Mr. Smith had "ample opportunity to observe the defendant" while "engaged in a heated argument with him" and later when Mr. Caesar "approached the car from the front and the side"; (2) Mr. Smith's "attention was directly on Mr. Caesar, given the very heated argument that can be heard in . . . the dash cam"; (3) Mr. Smith's description of Mr. Caesar was "general, but it was accurate, black male with dreads wearing all black, at least six feet"; (4) the trial court found that the identification was "a pretty emphatic ID, and he recognized him right away"; and (5) the identification was "immediately after this incident." The trial court also found that the detective's testimony concerning the identification was credible.

**1.     The Trial Court's Comparison of Mr. Caesar with the Video**

Mr. Caesar now argues that the trial court's reference to viewing the dash cam footage showed an erroneous reliance "on its own comparison of Mr. Caesar and a

man depicted in video footage not used in the identification procedure." He references the trial court's statement that:

> I could observe the video that was Government's Exhibit 2, which is the dash cam on Mr. Smith's car, and it seemed evident to the Court, just seeing the video where Mr. Caesar walks in front of the car, that it is apparent that it's Mr. Caesar. So that supports also, the, I think the reliability of the complain[an]t's description . . . .

But this reference misses that later the trial court clarified its use of the video: "I'm not relying on [the comparison to the person in the video to Mr. Caesar] in terms of finding that [the identification] is reliable. I'm relying on the *Biggers* factors. I thought I made that clear, but maybe I didn't. If it wasn't, I'm relying on the findings I just made under *Biggers*." Mr. Caesar contends that "[w]hile the trial court later sought to walk this statement back, it is difficult if not impossible to square the latter with its statement just moments earlier."

Given that the dash cam footage and the surveillance footage from the Salvation Army warehouse depict interactions between Mr. Smith and Mr. Caesar prior to the shooting, it was appropriate for the trial court to have viewed the video in coming to its findings under the *Biggers* factors. Furthermore, the dash cam video was admitted into evidence without objection and played during the direct examination of the detective during the motions hearing. The trial court explicitly referenced *Biggers* three times in its ruling, systemically walked through the five

factors, and clarified, when questioned by counsel, that its reliability determination was not based on its own viewing of the dash cam video. As such, the record does not support Mr. Caesar's claim that the trial court relied on "forbidden inferences" in its reliability determination. Specifically, Mr. Caesar's reliance on the court's statement in addressing factor three, that the video showed that Mr. Caesar's appearance matched Mr. Smith's description of his appearance, without more, does not overcome the presumption that the trial court is presumed to follow the law. *See Saidi v. United States*, 110 A.3d 606, 613 (D.C. 2015). Nothing in the record supports concluding that the court's statements were untethered from its analysis of the factors, as required.

## 2. The Out-of-Court Identification Procedure

Mr. Caesar next argues that the identification procedure was not reliable and that the government failed to meet its burden of proving that the results were nonetheless reliable because Mr. Smith lacked an opportunity to observe the shooter, had split his attention between the shooter and his environment during the earlier argument, and provided only a generic description of the shooter to police prior to making the identification. We note that both parties agree that the out-of-court identification was "inherently suggestive," given our longstanding determination that "single-photo displays are inherently suggestive and have been designated the

'most suggestive' and therefore the 'most objectionable method of pretrial identification.'" *Morales*, 248 A.3d at 173 (citation modified) (quoting *Patterson v. United States*, 384 A.2d 663, 666 (D.C. 1978)). Accordingly, the issue of suggestiveness is dispelled, and we need only consider whether the identification was reliable.

Mr. Caesar argues that the facts in this case are similar to the unreliable identification in *Morales*, where the witness, a police officer, described a suspect by his sex, race, hat, a jacket tied around his waist, and tattoos on his face and neck. *Morales*, 248 A.3d at 178-79. However, Mr. Caesar fails to address this court's holding that under the first and "most important factor in determining an identification's reliability"—opportunity to observe—the officer in *Morales* had only "minimal" time to observe the suspect, an interaction that "lasted about a minute," which primarily involved a view from behind as the officer gave chase and only "two to three seconds from a distance of ten to twenty-five feet" during which the officer could view the suspect's face. *Id.* at 177.

Conversely, the trial court here found that, prior to the identification, Mr. Smith "was observing the defendant for around two minutes, directly . . . [and] was engaged in a heated argument with him under conditions where it seems he had ample opportunity to observe the defendant," and then had a second opportunity to observe him when Mr. Caesar came up to the car, kicked it, punched it, tried to open

the doors, and continued yelling at the occupants. The trial court also credited the detective's testimony that it was a "beautiful" and "sunny" afternoon, which was supported by the video footage. And although, as Mr. Caesar notes, there were "periods of time when the two did not face one another," the surveillance video shows that for the vast majority of the two-minute argument the two men were standing face to face on opposite sides of the chain-link fence, inches apart. The trial court further found that Mr. Smith's description of Mr. Caesar was "general" but "accurate."

We disagree with Mr. Caesar's assertion that the trial court erred in finding that Mr. Smith directed his attention to Mr. Caesar for around two minutes. Rather, our review of the record, which is deferential on this factual issue, shows that the trial court's language is supported by the surveillance footage, dash cam video, and the testimony of officers. Because the identification was sufficiently reliable and based on an appropriate weighing of the factors, we conclude that the trial court did not err in denying Mr. Caesar's motion to suppress the out-of-court identification.

### 3. The In-Court Identification

Mr. Caesar further claims that the in-court identification (when Mr. Smith nodded his head towards the defendant in response to a government question, "[W]ho made that statement [in the dash cam video]?" was also in error, but he offers

no additional argument as to why, other than by referencing the government's earlier statement that it thought Mr. Smith would not be able to identify Mr. Caesar. At best we can tell, Mr. Caesar is asserting that the in-court identification was unreliable because it was tainted by an unreliable out-of-court identification; yet, because we hold that the out-of-court identification was reliable, we cannot conclude that the in-court identification was unreliable. *See Young*, 305 A.3d at 437 n.23 ("Because we have concluded that the earlier identification was reliable and admissible, there was no taint that would invalidate the [later] identification made upon viewing the photo spread."). Accordingly, we hold that the trial court did not err in denying Mr. Caesar's motion to suppress the in-court identification by Mr. Smith.

### 4. Harm

Because we conclude that the out-of-court identification was sufficiently reliable, we can end our analysis here. Nevertheless, for the sake of completeness, we note that even if the record supported concluding that the identification was unreliable, Mr. Caesar would still have to successfully argue that the government failed to demonstrate that any error was harmless beyond a reasonable doubt. *See Morales*, 248 A.3d at 181 ("We must therefore reverse Mr. Morales' convictions unless the government has 'prove[d] beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.'" (alterations in original) (quoting

*Chapman v. California*, 386 U.S. 18, 24 (1967))). We agree with the government's position that "any error was harmless beyond a reasonable doubt" because of the additional identification evidence presented to the jury that made his identity a near certainty. Indeed, there was no evidence of mistaken identity, for example, that someone else had been mowing the grass that day or had been arguing with Mr. Smith who could have been mistaken for Mr. Caesar. Further, there was no possibility that the person mowing the grass was not the same person who argued with Mr. Smith. As a result, we hold that even if the admission of the identifications of Mr. Caesar were in error, that error was harmless.

## C.      Insufficiency of the Evidence

Mr. Caesar additionally argues that the evidence was insufficient to support his convictions for the two ADW charges. He reasons that "the evidence was insufficient to permit finding beyond a reasonable doubt that he 'acted in such a manner as would under the circumstances portend an immediate threat of danger'" to Mr. Smith and Ms. Greene. His argument focuses on three key facts: (1) Mr. Smith and Ms. Greene did not see a firearm, (2) Mr. Smith and Ms. Greene only realized after the fact that they had been shot at, and (3) the bus driver, Anthony Graham, who witnessed the shooting could not see what or who was being shot at.

This court "review[s] a claim of insufficient evidence de novo, considering 'all the evidence in the light most favorable to the verdict [and] according deference to the factfinder to weigh the evidence, determine credibility, and draw justifiable inferences of fact.'" *Ross v. United States*, 331 A.3d 220, 224 (D.C. 2025) (second alteration in original) (quoting *Wicks v. United States*, 226 A.3d 743, 746-47 (D.C. 2020)). This court will "affirm the trial court's judgment if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)). "The evidence need not 'compel a finding of guilt beyond a reasonable doubt,' and it need not 'negate every possible inference of innocence.'" *Long*, 156 A.3d at 712-13 (quoting *Napper v. United States*, 22 A.3d 758, 770 (D.C. 2011)). "Rather, a defendant pursuing an insufficiency claim on appeal 'must establish that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt.'" *Id.* at 713 (quoting *Carter v. United States*, 957 A.2d 9, 14 (D.C. 2008)).

The jury instructions provided at trial list the following elements that the government had to prove beyond a reasonable doubt for the jury to find that Mr. Caesar had committed assault with a dangerous weapon:

1. Mr. Caesar committed a threatening act that reasonably would create in another person a fear of immediate injury;
2. Mr. Caesar acted voluntarily, on purpose, and not by mistake or accident;
3. At the time, Mr. Caesar had the apparent ability to injury a person; and
4. Mr. Caesar committed the threatening act with a dangerous weapon, that is, a firearm.

Additionally, the jury instructions stated that "[v]oluntarily pointing a dangerous weapon at another person in a threatening manner, or voluntarily using it in a way that would reasonably create in the other person a fear of immediate injury, would be an assault with a dangerous weapon" and that "[t]he government need not prove the defendant intended to injure Mr. Smith, Ms. Greene, or L.R.S."

This court has defined intent-to-frighten assault to include "requir[ing] proof that the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct[.]" *Powell v. United States*, 238 A.3d 954, 957 (D.C. 2020) (second alteration in original) (quoting *Parks v. United States*, 627 A.2d 1, 5 (D.C. 1993)).

> In order to prove intent-to-frighten assault, the government must show "(1) that the defendant committed a threatening act that reasonably would create in another person a fear of immediate injury; (2) that, when he/she committed the act, the defendant had the apparent present ability to injure that person; and (3) that the defendant committed the act voluntarily, on purpose, and not by accident or mistake."

*Id.* (quoting *Joiner-Die v. United States*, 899 A.2d 762, 765 (D.C. 2006)).

"The major distinction between [intent-to-frighten assault and simple assault] is in the nature of the intent element that must be proven," a difference between "purposeful design either to engender fear in (intent-to-frighten theory) or do violence to (attempted-battery theory) his victim." *Parks*, 627 A.2d at 5 (citation modified). But notably, "while the subjective perception of fear or apprehension by the victim in a particular case may be relevant, neither theory requires factual proof that the victim actually experience apprehension or fear as one of the essential elements." *Id.* (citation omitted). "Rather . . . the crucial inquiry [is] whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Id.* (citation modified). For instance, "[a]n intent to frighten can be inferred from the defendant's conduct (for example, from the pointing of a gun)," but "'[m]ere words are not sufficient' to constitute a 'threatening act.'" *Powell*, 238 A.3d at 957-58 (first citing *Robinson v. United States*, 506 A.2d 572, 575 (D.C. 1986); and then quoting *Cousart v. United States*, 144 A.3d 27, 32 n.11 (D.C. 2016)).

Mr. Caesar argues that no reasonable fact-finder could have found that the elements of intent-to-frighten assault had been met because Mr. Smith and Ms. Greene never saw the gun and only heard noises that they later discovered had been gunshots. The dash cam footage demonstrates that the couple discussed the possibility of Mr. Caesar having a gun when he came around the front of the

Salvation Army and approached their car while they waited to exit the McDonald's parking lot. Both witnesses stated at trial that they either did not see (Ms. Greene) or did not notice (Mr. Smith) if Mr. Caesar had been wearing his cross-body bag during their first encounter (he was), but that they saw it and were alarmed by its presence in this second encounter because they thought he might have a gun. Unlike the earlier at-the-fence argument, when he approached the car, Mr. Caesar had his left hand in the bag, elbow cocked, holding it in front of himself, as if prepared to pull something out of it. At one point, Ms. Greene stated, "He's got . . . he's probably got a gun." Mr. Caesar said something indiscernible in response. Then Ms. Greene asked him, "What you got in there?," and comments a few seconds later, as if to herself, "You ain't got shit in that f***ing thing." During this conversation, Mr. Caesar pulled on the car door handles and followed the car into the street to continue kicking and punching the passenger side. Ms. Greene testified that she could see the bag "clear as day" because "he's right there in front of me . . . [i]f I opened the car door, I would hit him." As they drove away, both Mr. Smith and Ms. Greene testified to hearing "bullets hitting our car," "gunshots . . . hitting the back of my car," and the jury was also able to hear the noise in the dash cam footage. Additionally, Ms. Greene's demand on the audio that they "Go, Go, Go!" as Mr. Smith continued driving away from Mr. Caesar, tends to support the idea that she feared they were being shot at and needed to get to safety.

Given this evidence and their testimony that they felt they needed to get a safe distance away from Mr. Caesar and any possible pursuit, a reasonable juror could weigh these considerations and conclude that Mr. Caesar had fired a gun at their car—even though Mr. Smith and Ms. Greene did not testify to seeing a gun. Moreover, a reasonable juror could find that the government had met its burden of showing that Mr. Caesar had "committed a threatening act that reasonably would create in another person a fear of immediate injury" by holding his hand in his bag in front of his body, attacking and attempting to get access to the car, and then shooting at the car multiple times, which "would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Powell*, 238 A.3d at 957-58 (citation omitted). This evidence also shows that Mr. Caesar intended to injure or to create an apprehension of injury in Mr. Smith and Ms. Greene. *See id.* at 957.

Additionally, Mr. Caesar's argument about Mr. Graham's testimony fails because the government did not rely on Mr. Graham's testimony, as the only witness who saw the gun, to show that Mr. Caesar's actions would have caused a reasonable person in Mr. Smith's and Ms. Greene's circumstances to experience an immediate threat of danger. As such, the alleged "disqualifying" discrepancies in his testimony are not relevant to this court's review of what a reasonable juror could find.

Accordingly, we hold that, considering all evidence in a light most favorable to the verdict, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ross*, 331 A.3d at 224.

### D.    Sentencing Discretion

The court sentenced Mr. Caesar to (1) a mandatory minimum sentence of sixty months for the merged counts of possession of a firearm during a crime of violence, and (2) a sentence of eighteen months—the bottom of the guidelines—for each of the two assault with a dangerous weapon counts. The court ran the latter two counts and the PFCV counts consecutively "because there are two separate victims at issue here." Mr. Caesar argues that the trial court erred in his sentencing due to its incorrect belief that the statutory scheme, as explicated in the Sentencing Guidelines, required that his ADW sentences should run consecutively, and, thus, that resentencing is required to correct this error of law.

The standard by which we review sentencing procedures varies based on the measure of discretion given to the court under the circumstances." *Bradley v. Dist. of Columbia*, 107 A.3d 586, 595 (D.C. 2015). Discretionary sentencing decisions are generally reviewed for abuse of discretion. *See Williams v. United States*, 345 A.3d 570, 579 (D.C. 2025). However, this court "review[s] 'fundamental legal errors in the sentencing process . . . de novo.'" *Dalton v. United States*, 58 A.3d 1005, 1015

(D.C. 2013) (quoting *Thorne v. United States*, 46 A.3d 1085, 1089 (D.C. 2012)) (noting, for example, that a trial judge may not punish a defendant for exercising his Sixth Amendment right to trial.). "A court 'by definition abuses its discretion when it makes an error of law.'" *Frankel v. D.C. Off. For Planning & Econ. Dev.*, 110 A.3d 553, 558 (D.C. 2015) (quoting *Ford v. ChartOne, Inc.*, 908 A.2d 72, 84 (D.C. 2006)). Accordingly, Mr. Caesar's claim that his sentence was based on an error of law is reviewed de novo.

Under D.C. Code § 23-112, consecutively-running sentences are the default:

> A sentence imposed on a person for conviction of an offense shall, unless the court imposing such sentence expressly provides otherwise, run consecutively to any other sentence imposed on such person for conviction of an offense, whether or not the offense (1) arises out of another transaction, or (2) arises out of the same transaction and requires proof of a fact which the other does not.

Further, the 2023 Sentencing Guidelines, which were current during the time of Mr. Caesar's sentencing and relied on in the court's sentencing consideration, aver that "[t]he determination of whether offense shall be sentenced consecutively or concurrently is a determination ultimately made by the Court." Voluntary Sent'g Guidelines Manual, § 6.0 (D.C. Sent'g Comm'n 2023). Nevertheless, the Guidelines distinguish between counts that must run consecutively versus those that must run concurrently and designates those that do not fall into either category as being left

to judicial discretion to run either consecutively or concurrently. *Id.* at §§ 6.1-6.3. "Counts sentenced on the same day *must* be sentenced *consecutively* where they comprise . . . [m]ultiple crimes of violence involving multiple victims in a single event." *Id.* at § 6.1(a)(1). Crimes of Violence are listed in D.C. Code § 23-1331(4)—a list which includes assault with a dangerous weapon but not possession of a firearm during a crime of violence. *Id.* § 6.1(a)(1) n.35. Conversely, "[c]ounts sentenced on the same day *must* be sentenced *concurrently* where they comprise . . . [m]ultiple counts for offenses in a single event not defined as 'crimes of violence' . . . or [c]ounts for which a concurrent sentence is required by statute." *Id.* at § 6.2. The Guidelines also include a hypothetical demonstrating the lowest and highest possible aggregate sentences as determined by whether the judge imposes sentences of possession of a firearm during a crime of violence to run consecutively or concurrently to the underlying offenses. *Id.* at § 9.16.

Mr. Caesar contends that "[n]either the ADW nor PFCV statute nor any provision of the Voluntary Sentencing Guidelines indicate, as the trial court stated when sentencing Mr. Caesar, that sentences for ADW 'should' run consecutive to the PFCV counts associated with the same." He later clarifies that the issue revolves around the possibility, "strongly suggest[ed]" by "the trial court's words," that "[the trial court] believed the *PFCV* statute required it to sentence the ADW and PFCV counts consecutively to one another . . . ."

First, on the question of whether the trial court had the ability to order the sentences to run consecutively, we look to D.C. Code § 23-112, which creates a default for consecutively-running sentences but grants courts discretion to impose concurrently-running sentences. We need not dwell further on the claim that the trial court did not have discretion, as Mr. Caesar fails to point this court to any relevant case law where we previously held a trial court's decision to have sentences run consecutively rather than concurrently to be an error of law, and because it is not for the court to "create the ossature for the argument[] and put flesh on its bones," "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

Turning to Mr. Caesar's argument that the court's statements at sentencing showed it did not understand it had discretion: While Mr. Caesar is correct that the ADW and PFCV statutes say nothing about whether sentences for these offenses should run consecutively or concurrently, D.C. Code § 23-112 states a preference for consecutively running sentences that a court must expressly override, and Mr. Caesar points to nothing in this record to suggest that the court did not understand that presumption or that it was not referring to D.C. Code § 23-112 when it referenced "the statutory scheme" in its sentencing decision. In the absence of any

compelling reason to rebut that foundation, we are bound by the presumption that the court was following the law. Further, we find persuasive the Sentencing Guidelines' guidance, which describes a similar scenario to the choice before the court in this case, in which PFCV counts are given either consecutive or concurrent sentences to their underlying offenses to illustrate the lowest possible aggregate sentence and the highest possible aggregate sentence. D.C. Sent'g Comm'n 2023 § 9.16 (2023). This supports the classification of PFCV sentences within the "judicial discretion" category of § 6.3, as opposed to the "concurrent" category of § 6.2, which includes "[m]ultiple counts for offenses in a single event not defined as 'crimes of violence' pursuant to D.C. Code § 23-1331(4)." *Id.* at §§ 6.2-6.3. Therefore, there is no error of law in the trial court's decision to run the PFCV counts consecutively.

## III.    Conclusion

For the reasons set forth above, the judgment of the Superior Court is affirmed.

*So ordered.*